We have changed the court. I'm Stan Berman, appearing on behalf of the California parties, the petitioners. I would ask to reserve three minutes for rebuttal. I'll first address the netting issue, which is really an issue about how FERC calculates refunds. In order and after order, over the years in this case, FERC has established how refunds will be calculated for the refund period. PMMCP, the mitigated market clearing price, is applied as a calc in each interval and is run through the ISO and PX billing software to rerun the market for the refund period. The results from the ISO and PX billing software are aggregated together, netted, and spit out to produce a net refund result for each market participant. If, buried in that calculation, $50 million was owed for sales by a market participant and $10 million was owed to each participant for its purchases, what would spit out at the end was that it was a $40 million net refund care. If those numbers were reversed, it would spit out that it was a $40 million net refund recipient. Whether someone is a refund care or refund recipient mattered. For example, cost offsets are no longer part of this appeal. FERC's rules about cost offsets provided that if you were a $40 million net refund payer, you were entitled to up to $40 million in cost offsets. Not more, not $50 million, $40 million in cost offsets. On the other hand, if what spit out at that period-wide aggregation of refunds was that you were a net refund recipient, you could be allocated the cost offsets. So again, FERC did the calculations period-wide, adding everything together, and those results mattered. Can you recall this period? The period was the refund period in this case, which was October 7, 2003, June 20, 2001. It should have been easy for FERC to implement this court's order in Bonneville v. FERC, given the way that this process worked. FERC could and should have just relied on the refund calculations I just described. Everyone was brought through the system. Results spit out. And if it spit out for the governmental entity that it was a $40 million net refund payer, well, as a result of your Bonneville decision, that $40 million was something that FERC could not order that governmental entity to pay. It was not $40 million would effectively be wiped out by FERC. And if the California parties, the buyers, wanted to get the refund $40 million, they had to go try to obtain relief elsewhere. That's not what FERC did. Instead of doing that, in the example I described above, FERC said, we're going to call that governmental entity, we're going to wipe out $50 million and give that governmental entity $10 million of refunds paid by the market. So, again, it was someone who might have run through the ISARPX billing software with the MFCPs, but owe $40 million of refunds. But FERC said, you'll get $10 million in refunds. And these were all just allocated to the market, but FERC said, the market, that includes buyers and sellers, and the sellers have already paid the refunds. We're not going to make them pay net more refunds for other guys. So they said, the only folks left to bear the cost of the refunds that were now owed to those governmental entities were the buyers, the net refund recipients. So FERC said the $10 million that was being paid to the sellers, the seller governmental entities, would have owed $40 million of refunds. And that $10 million would be paid by the buyers, by the California parties, the petitioners in this case. And so the petitioners in this case are paying not just people who overcharged markets, but people who have been found as a result of trials that were held in this case to have committed the same terror violations that have been found on this court address, the NPS Works and Services v. FERC. Because the only two governmental entities that are left in the case were Arkansas, Weber, EPA, and WACA. And both of them were found in the 2012 trial that led to $85.30 to have committed the same violations as the other sellers who were paid by the NPS Works and Services. FERC's rulings on this are not consistent with the obstacle tariffs. They're not consistent with the many firm orders in this case that provide for period-wide netting as the basis for refund calculation. It should have resulted in unlawful discrimination on a reasonable basis. Could you point to me where to look in the MESA tariff or the PX tariff that actually mandates period-wide netting? Well, Your Honor, I'll say MESA and PX tariffs both have provisions that span a variety of time periods. As we've said in the tariff, they were provisions that provided for no longer than 10-minute intervals for some things, month-long intervals for other things, such as the grid management charge, and provide that everything is put together in a monthly invoice section, 11.9 of the MESA tariff, which means that the supplemental insurance record, 11.9 provided for monthly invoicing, those amounts that came together, and then section 11, page 6.2 of the MESA tariff, which is a CPER 640, provides that each scheduling coordinator shall pay any net debit and be entitled to receive any net credit on the invoice. So everything is rolled up into a monthly invoice, and then people are responsible for paying or receiving the net amount that is on the monthly invoice. Is that the only interval when money changed hands? Your Honor, prior to the amendments related to this case, it was the monthly invoice, which was the only money-changing hands part of the tariff. Again, the billing process was complex. In 10-minute intervals, hourly intervals, those were all coming to date. Submittals, debits, and mortgage purchase scripts, they reviewed those, and then that goes into the monthly invoice that contains all of the charges that accrued over the course of the month added together. And then from the pay fund period, the ISRPX looked at that process and realized that that process had to change for the refund period. Among other things, the process is the tariff. These written sales notes, they get to an adjustment for a given month, and they have a certain amount of time to review it, and then any errors will be put on to the next month's bill. Okay. I don't think you have an answer to the question, or if you gave one, I missed it. The only thing I heard was that in 11.9, there is this monthly invoicing, and that doesn't necessarily make it inconsistent with the 10-minute netting, does it? I mean, what I'm looking for to see whether there's discretion in this is I'm looking for something in the tariff that I look to, the language in the tariff that I should look to, that basically mandates this period-wide basis. I think it's up there, and I should look elsewhere. But in your argument, I read your brief, and you cite you basically something to the effect of netting order that occurs on a monthly basis, but then you then cite back to your own petition for re-hearing, and not to the tariff suit. Oh, yeah. Judge McKinnon, ordinarily, you got over a monthly basis, and that applies to 11.6.2. I think we all agree that that's what it says, and that's what that would mean. But that's what it said normally. And then the camps in ISO put forward their two amendments for the refund period. They gave the monthly billing process didn't work for the refund period, and they put forward amendments 51 for the ISO and amendment 23 for the camps. And what those did was they created a walled-off billing period for the entire period. They said we can't do this monthly stuff. That's not good enough for the refund period. We need to do calculations for the whole period and then provide a period for everyone to review their calculations for the whole period, and then the results will all be sent separately, most part of the regular billing process. And so FERC approved those changes for the refund period. They're not really built into the regular ISO and PX tariff. They were special amendments, air quotes, that were added to the tariff to provide that they would follow a different process for the refund period. Those orders that provided that different process for the refund period are basically consistent with a whole slew of orders during the case that provide for period-wide billing to determine what the refunds are, besides in a brief state, for orders that provide for period-wide billing. And if I could read from just one of your orders. Your orders. This is the May 12, 2006 order, which is at 115 FERC 6.171, and it looks at paragraph 34. And there FERC first describes cost offsets and describes how cost offsets are calculated, and it describes them as being calculated on a net basis, and then it says about refunds. Refunds, as well, are calculated on a net dollar basis, meaning each market participant's refund obligation, the amount of energy sold at prices above the MMCP, with its refund receipts, the amount of energy purchased at prices above the MMCP. What FERC said there about refunds is exactly what we say, that there's a calculation that involves a period-wide netting. Now, what FERC said to explain away this particular paragraph is, well, that basically this is about cost offsets. But if you read this order, this 2006 order, at paragraph 34, what you see is that they first say that cost offsets are allocated using, are determined using netting. And then they said refunds are determined using a netting. And then they use that as their reasoning to say that they will use that period-wide calculation on refunds to determine who's the net refund recipient, and they will then allocate the cost offsets to those net refund recipients. But FERC was recognizing what was an especially given procedure that had been laid out in order after order through 2006, finding that there would be a period-wide netting that was used in the calculation of refunds. That's what they were talking about in 2006. Let me put out that order. You do have three minutes. Do you want to reserve? All right. Yes, Your Honor. Good morning, Your Honor. It's Bethan DeSalva for the commission. The commission made very clear in its orders, interpreting as all prior orders, that it had never previously ordered refunds to be netted over the entire refund period. And, in fact, these challenged orders was the first time the commission addressed the period over which refunds would be netted. There's nothing that the counterparties point to in any of the orders that it cites. Talk about the time period over which netting is to occur. They talk about that netting will occur, but not the time period over which that will occur. And so then the commission went and interpreted the tariffs and determined that they required hourly netting of purchases and sales. That was the largest time period over which purchases and sales were netted. So the commission applied the largest time period. That included how parties wanted refund-wide, refund-period-wide netting, nine-month period. There was nothing to indicate that they could do that. And then the commission applied the general netting period and the tariff of purchases and sales, which was hourly. Why is it hourly? Is that where the rate's hourly? It's the rate. I don't actually – it's a good question, Your Honor, and I don't really answer why the tariff provides that it's hourly. It just is, again, that's what the commission had applied. Purchases and sales are netted hourly.  netting refunds to purchases and sales, which is what you need to determine the difference. And it also applies to hourly netting. But if we don't know why they used hourly in the first place, it's hard to understand what compels or what drives the use of it in this context. If people are necessarily hourly. Who do you think said hourly? I just don't know. I don't know. I'm trying to figure it out. We've been through so many of these cases, I confess I'm thoroughly lost, but it seemed to me at one point I had the impression that it's basically because the rates are being set on an hourly basis. You couldn't do it in a longer time period because you'd have different rates. And so if you've got an hour when the rate's higher, an hour when the rate's lower, you can't mix them together. You're going to lose the effect of the varying rates. But nobody actually pays money on an hourly basis. So I'm not sure. I mean, I can understand the calculation needs to be done when you make the adjustments, what the rates should have been and so forth. But I'm not sure I understand why it is that somebody who is, in this case, government-owned utilities who are net sellers wind up being treated a whole lot more like they are buyers than sellers. Well, let me just say, I don't know. No one argued that it shouldn't be done, that purchases and sales are not netted hourly for purposes of charges. I can understand the logic of this, for example, but that doesn't answer the question as to why that. Because nobody actually pays money over on an hourly basis. Then why do we assume that we treat like each hour is by itself independent and don't take a step back the way that the California parties argue? I mean, let's look at the big picture. Because that wasn't their argument. Their argument is that the tariff requires this because there's monthly billing. And the commission's answer back was, no, charges are netted hourly or in smaller intervals, but the largest interval is hourly. And then they're just summed up, and then they're not netted additionally after that, or they're only summed up after that. So you're distinguishing between basically the calculation of the charge and what in normal terms, but may not in firm terms, basically called an invoice, which comes at the end. That's the difference between invoicing and the choice, right? So the netting occurs on an hourly basis. Billing occurs on a monthly basis. And the religious isn't part of this record. Sorry, I was hinting at the answer. If that starts to beg the question, then why does the commission make the decision? This is the question that does matter here. That we're going to look at whether somebody is a buyer or seller only on an hour-by-hour basis. And in the case of government utilities, disregard the seller part because they can't be ordered to pay refunds, but still treat them as buyers. And, in fact, over the long haul, there are far more sellers than buyers. I mean, there's some context where offsets can kick in. I guess I just don't understand if there's any logic behind the treatment of the refund period as one solitary, as not as one solitary time period to see what's the big picture effect, plus or minus, but rather looking narrowly at hour-by-hour and stacking up one but not the other. Well, the hourly netting requirement applies to all entities for refund businesses. And everybody else. This is the only one that seems to matter. I understand what you're saying, Your Honor. I think part of the commission's concern was complying with this court's mandate and bottom line was part of its concern, but that would only regard governmental entities. I think the commission would have made the determination regarding all entities, many of them, but the commission was being very careful to ensure that it was hitting consistently with what the tariff requires so that it wouldn't be requiring governmental entities to be refunded, which this court has made clear the commission could not do. The commission was very careful to make sure that it was staying within that line. So what's the import of the amendments? What are the amendments to the tariff? The tariff amendments have nothing to do with the decision, Your Honor, I think didn't address the question at all of how to calculate refunds. Amendment 51 simply permitted the California ISO to segregate refund period transactions from current transactions so that the California ISO would be able to conduct a refund settlement, reruns, and invoice adjustments in order to calculate refunds. It was trying to come up with a baseline number for where you start to calculate refunds from. So Amendment 51, that order explained that without the wall-off, what was happening is charges and adjustments for past trainees were being added to current month's settlement statements and invoices. So they had to have a wall-off of refund period transactions or else they were being added automatically onto transactions that were currently occurring in the California ISO. And Amendment 23 simply extended time periods filed to schemes regarding California ISO preparatory adjustments and rerun settlement statements, and that's all it did. It didn't do anything else. So neither of those addressed anything having to do with what the refund ending period would be. Since we're looking at this on arbitrary and capricious, everything up to the past had been done more in a period-wide basis, and you've just indicated that our final decision to make sure that government entities aren't paying themselves is just a small part of it. Why then isn't it arbitrary and capricious to shift ground and do something totally different here? This isn't shifting ground, Your Honor. This is, again, the first time the commission addressed the time period or was refund scheme being added. So there are all kinds of MMCP, for example, that's done on dependent individuals. So this is determined on hourly adjustments. This is just different time periods for different things. And the commission is in each circumstance indivisibly, and you hear the commission interpreting tariffs. And, again, the judge has to interpret and determine that the tariffs themselves require, again, Section 3.2.1 in conjunction with Section 11.6 of the California ISO Tariff require hourly netting of sales and purchases and Section 6.7.2 for the California BX requires the same. So while the commission is just looking at it appropriately and determining what actually the tariffs require and applying that standard here. I don't know if the court wants me to discuss any of the orders. Again, I would just give the general statement that none of the orders that the Cal Party cite seek anything whatsoever about netting, and that the commission's determination here was consistent with the tariff and appropriate. I don't know if the court wants me to go on. I'm sorry. I'm struggling to find out if there's any reason or logic behind it other than, let's see if I'm correct, concern about compliance with our decision in Vaudeville Do you have a desire to be consistent with what the commission understands the pre-existing tariff to provide in terms of tariff? Is there anything else that explains the decision in this instance? That's... I just want to make sure I'm not missing anything. I mean, I'm pretty happy to have that presented here, but I think that is the commission's basis. Is there anyone with the court who would like me to discuss the $5 million dollar phone bill? I don't have anything to provide in particular, other than the reply brief and the opening brief, but let me just explain, Your Honors, that the commission's faced with an unusual circumstance here. There was a long, almost 10-year delay between discovery, between the time that this $5 million was spent and the time that it was discovered that they were spent improperly. And so it was clear that, as the commission found out, it couldn't be precisely determined how those funds were spent. So normal cost causation principles just didn't apply. You couldn't say we're going to... In California, parties were arguing you should apply it to all participants, but the commission's response back was, we don't know how those funds were spent. We don't know. How can we say that those funds were spent for the benefit of or because of any particular participant? So it could have just been much more selective than that, so that the commission is not... And those that they were spent for the benefit of the people that are standing in line for refunds now? No, we don't know that just yet, Your Honor. That's right. So the best you can say is that the funds were spent to keep the operation going? We know at that time if they were spent for some purpose, it could have been literally, I think California High School was a continuing institution in California, but I can't really think of any good instance that we don't know who the funds were spent for. It could have been spent for a very specific purpose. There's really no link. That's what troubles me. And I suppose that you're saying, well, it's better convenience to do it the way we did it. Is that the bottom line? I don't think so, and I don't think that's right, Your Honor. I think what the commission's next step was that it determined, okay, now we are left with a shortfall in the amount from which refunds will be paid, and in a circumstance where it's not the fault of any market person, it is, and we have a refund shortfall here. It's effectively a refund shortfall. The commission applied it the same way it applied the Bonneville refund shortfall. No one's challenging that. The commission applied the Bonneville refund shortfall, and it's an equitable, fair way when you have a refund shortfall, which is the practical solution here. The commission's motto is practical, not because it's easy. It's actually not easy. I think the Bonneville refund shortfall reform is right. That's the way the commission viewed this as well, Your Honor. The commission felt because we can't allocate it to any particular entities based on normal classification principles, we now have a $5 million refund shortfall, and we can allocate it in the same way that we allocated the refund shortfall that resulted because of Bonneville. That was the commission's analysis. Thank you, Counselor. Thank you. Your Honor, just a few brief points. First of all, the question came up with Counsel, whether hourly netting had come up in any other orders, or whether it was a concept that was just confined to these particular orders relating to coming to the money for the government's entities. My answer is that it does not come up in any other orders, and the commission is not able to say to any other orders whether they ever implemented or used hourly netting. It was an unknown concept except for these orders. Indeed, even in these orders, the commission uses other forms of netting. I'll point you specifically to the July 15, 2011 order, and the February 3, 2012 order number two, which are two of the several orders that address hourly netting. These happen to be the two orders that also address the issue of the allocation of the $5 million shortfall. And I need to point out that in those orders, the commission says allocate the $5 million shortfall among net refund recipients. It's just even bothering to say period-wide, because everyone knew it was period-wide. When they said net refund recipients, they were using the term of art that had been used for the occasion of the case. Based on the way every order had provided, the refunds would be calculated. They said allocate it among net refund recipients because net refund recipients was the way things were done. They never even thought of questioning or considering should we allocate the $5 million shortfall amongst people based on hourly amounts. They never even addressed hourly amounts, because other than in the governmental entity situation, they've never used or relied upon the hourly netting concept. As to the $5 million shortfall, I'll just add that the $5 million was taken from the PX account, where buyers put in money that was paid to sellers. So it was an account maintained for buyers and sellers. And the PX withdrew these funds to continue its operations, calculating the amounts owed and owed by buyers and sellers. Our position is that the funds came from an account that was for buyers and sellers. It was used to fund the PX, which was used for buyers and sellers. And so the costs would have been allocated to buyers and sellers. Not what FERC did, which was allocated to buyers alone for no good reason. Thank you, Kirsten. Thank you, Your Honor. Before we leave, can you tell us what the status is of the cost offset agreement? I just want to know where you are in procedures. Yes, Your Honor. The, um, we sent a letter to the court explaining that the hearing and settlement judge procedures had been set. Right. And, um, and... Do you have a date for those? Is that contained in the letter? I don't have a date for those. Do you have any further information on that? Yes, Your Honor. I did participate in that. It was set for hearing in January. And the first moral practice is to have settlement judge procedures before a trial starts. The settlement judge procedures are ongoing. We've met with the settlement judge. The parties did. They were exchanging certain information, and so we're having these discussions. And if those procedures are called in loggerheads, then a trial process will start. All right. Thank you. That's exactly what I was going to say. Thank you. Thank you. Thank you for your recognition, sir. You'll be submitted for re-session. It will be a re-session. Thank you.
judges: Thomas, McKeown, Clifton